HENRY K. CHAPIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59994.   Promulgated December 11, 1935.

*Samuel B. Kraus, Esq.*, for the petitioner.
*C. R. Marshall, Esq.*, for the respondent.

OPINION.

SEAWELL: Respondent determined a deficiency in income tax of petitioner for the year 1927 in the amount of $19,746.56.

The deficiency arises, in part, by reason of the respondent's determination that the petitioner realized taxable gain of $151,146.91 on the sale of a parcel of land based upon a fair market value of $100 per share for stock received as part of the consideration for the property, and further gain of $28,582.85 realized from a sale later in the year of a portion of the stock so received, computed on a cost basis of $100 per share. In his return for 1927 the petitioner placed no fair market value on the stock, and, since the cash received in the sale was less than his cost basis, reported no gain. As to the stock subsequently sold, he reported gain computed by deducting from the selling price the unrecovered cost basis of the land, increased by the amount of an assessment. The question is the fair market value, if any, of the shares of stock at the time received, the contention of the respondent being that it had a fair market value of $100 per share, as determined by him, and the claim of the petitioner being that the stock had no fair market value at that time.

The case was submitted upon a stipulation covering substantially all the facts and the tetsimony of one witness called by petitioner.

Petitioner is an individual, residing in Chicago, Illinois. In 1916 he purchased for investment at a total cost of $73,853.09 a parcel of real estate in Chicago fronting on Lincoln Park at No. 2430 Lake View Avenue, this realty being hereinafter referred to as the Lake View Site.

On or about November 19, 1926, petitioner and eight other men agreed orally to organize a corporation to acquire said Lake View Site and construct a cooperative apartment building thereon under a plan hereinafter appearing. Accordingly, on November 19, 1926, a corporation was organized under the laws of the State of Illinois by petitioner and the eight others, under the name of 2430 Lake View Avenue Corporation (the name was changed on December 24, 1926, to 2430 Lake View Avenue Building Corporation, hereinafter sometimes referred to as the building corporation). The authorized capital stock of the corporation was $550,000, represented by 5,500 shares of stock of the par value of $100 per share. There were nine stockholders, including petitioner, when the corporation was organized, but immediately thereafter another joined in the agreement with reference to the cooperative apartment and became the tenth stockholder, the ten being sometimes referred to hereinafter as the original stockholders. The entire authorized capital stock of the building corporation was subscribed for by the original stockholders at par. The petitioner received 1,750 shares thereof together

with $50,000 in cash, all in the year 1927, for the conveyance by him to the building corporation of the Lake View Site. This transaction was entered on the books of the building corporation at a cost to it of $225,000. The remaining 3,750 shares of the stock were issued in equal blocks of 416⅔ shares to each of the nine other original stockholders, as it had been subscribed. Under the plan adopted (at first orally, later embraced in the bylaws) the ownership of 323–9/17 shares of stock of the building corporation was a prerequisite to owning a proprietary lease in the apartment building. Each of the original stockholders held and retained such number of shares, designated as qualifying shares, in addition to shares not so designated. The original stockholders agreed, and it was later incorporated in the bylaws of the building corporation, that the stock in excess of qualifying shares held by each should be held for resale on the holders' own account, and that the stock should be sold only in blocks of 323–9/17 shares, contributed by all the stockholders proportionately out of their several holdings of stock above qualifying shares.

About the end of November 1927 an 18-story apartment building, containing 17 apartments, with space for laundry and storage room for each apartment on the basement floor, was completed on the Lake View Site at a cost of $1,113,940.88. It stood in an " almost unbroken line of the finest and most desirable skyscraper hotel and apartment buildings existing in Chicago." Money borrowed from a bank was used to pay part of the cost of construction and became an indebtedness thereafter assumed or paid proportionately by leaseholders. Apartments were allotted to each of the original stockholders. The entire fourth floor was allotted to petitioner, with usual basement space. The other nine original stockholders were each allotted a duplex apartment, that is, one half of two contiguous floors, one above the other, with basement space. This allotment of space to the original stockholders was agreed upon when the building corporation was organized.

Pursuant to authority granted by resolution of the board of directors of the building corporation on November 18, 1927, the ten original stockholders sold and transferred to Iver Lawson and E. A. Cudahy 323–9/17 shares each of the stock of the building corporation; and the proper officers of the corporation, under like authority, leased to Lawson the south apartment on the seventh and eighth floors, together with basement space, and to Cudahy the south apartment on the ninth and tenth floors, together with basement space. These leases commenced December 1, 1927, and the term extends to April 30, 2026. This is the term provided in the bylaws and in a form of lease prescribed November 18, 1927, by the building corporation for

all leases. The lease to the original stockholders contains the same term. Lawson and Cudahy each paid for the transfer of the stock and the granting of the " proprietary leases " the sum of $55,000 in cash to the former owners of the stock, and each assumed all the obligations contained in his proprietary lease contract, including payment of his pro rata share of the outstanding indebtedness of the corporation, of which $44,117.65 was apportioned to each apartment. Lawson paid the indebtedness apportioned to his apartment on December 1, 1927, and Cudahy paid that apportioned to his apartment on February 3, 1928. Of the $110,000 paid for stock in cash by Lawson and Cudahy, each of the original stockholders was credited with and received during 1927 an amount bearing the same relation to $110,000 as the stock of the original stockholders in excess of 323–9/17 qualifying shares of each bore to all such excess stock, and upon Lawson and Cudahy receiving their leases the original stockholders were relieved from all liability with respect to the two apartments taken by Lawson and Cudahy. The number of petitioner's shares sold to Lawson and Cudahy was 408.3264, for which petitioner received $69,415.49. On June 22, 1928, qualifying shares were sold to one Frank E. Wilhelm, with a proprietary lease of an apartment, for the same consideration as paid by Lawson and Cudahy each.

Upon the foregoing and all pertinent facts of the case, respondent contends that the shares of stock of the building corporation had a fair market value of $100 per share when acquired by petitioner, and that that value was petitioner's basis upon his sale of 408.3264 shares to Lawson and Cudahy. Petitioner's contention on the contrary, as expressed by his counsel, is " that in the very nature of things, and due to the fact that the value, if any, is bound up with so many speculative features, that no fair market value can be attributed to the stock." Summed up more specifically in the brief, it is contended that absence of fair market value of the stock is shown by the plan of the original stockholders to operate a residential apartment house on a mutual and cooperative basis for the exclusive use of the stockholders and without profit or remuneration to the corporation, under which plan " the sale, assignment, transfer or conveyance, either voluntarily or involuntarily, of any shares of stock of the corporation without the written approval of a majority of the Board of Directors shall not entitle the purchaser or assignee of said stock to receive a stockholder's proprietary lease of any apartment in the building "; that the total value of an interest in the corporation lies entirely in the use of an apartment—the lease— and none of it inheres in the stock itself, which stock can reap no profit, receive no dividend, and, under the restrictions of the bylaws, is itself not salable; that there were no contemporaneous sales of

stock, solely as such without lease rights, from which to judge the fair market value of stock alone; and that a witness for petitioner testified that, in his opinion, the stock, by reasons of such restrictions, had no fair market value, standing alone as such, which testimony was not contradicted by any other witness at the hearing.

The reasons assigned by petitioner are not convincing, and seem insufficient to overcome the presumption which favors respondent's determination, or to outweigh the evidence of fair market value produced on the trial. Before the corporation was formed those to compose the original stockholders entered into an agreement to accept at par all the stock to be apportioned among them. This was done and the price paid, not merely to give each of the ten original stockholders 323-9/17 shares of stock and a 99-year proprietary lease, but to insure the intrinsic value of the stock and lease by withholding sales to undesirable persons. Petitioner received 1,426-72/153 shares of stock in addition to his qualifying 323-9/17 shares, and each of the other original shareholders received 93-21/153 shares in addition to his qualifying 323-9/17 shares. These shares of stock in excess of 323-9/17 shares were paid for by the original stockholders, except petitioner, at $100 per share, but could not be availed of by them to secure a proprietary lease in the apartment building. No shareholder except petitioner held sufficient additional shares to make up a block of qualifying shares if he had been permitted to sell them. The agreement among the original stockholders also provided that the surplus shares were to be sold only conjunctively and proportionately to the shares each held. In this way petitioner was doubly insured against the encroachment of undesirables, for he held a veto power. Of course petitioner and the other stockholders at all times held the power to abrogate all restrictions on the sale of stock or leases. The restrictions were relaxed in a later year and two temporary leases, with option to convert them into proprietary leases, were sold.

When the usual power of unrestricted alienation is separated from ownership of property, the value of the property, as a trading commodity, is usually lessened; but not necessarily destroyed. *Frederick A. Koch, Jr., Executor*, 28 B. T. A. 363. Power of alienation, or its absence, would not affect the value of property in the hands of one who did not wish to sell. Restrictive agreements not to sell corporate stock do not necessarily deprive the stock of fair market value. *T. W. Henritze*, 28 B. T. A. 1173.

The sale of the stock of the building corporation in this case was restricted only to a class. All persons who were approved by the board of directors of the corporation as proper tenants of the apartments could buy stock from the stockholders and with the prescribed number of shares could secure a proprietary lease. The restriction

as to the class of purchasers could have been removed, or modified, by the stockholders and directors. It appears only inferentially that the increase in the price of the stock (about 70 percent above par) in the hands of the stockholders may have affected the sale of stock supporting the leases for the remaining apartments.

In affirming a decision of the Board involving a comparable question of law, the Circuit Court of Appeals for the Tenth Circuit, in *Newman* v. *Commissioner*, 40 Fed. (2d) 225; certiorari denied, 282 U. S. 858, said:

Where a person agrees to receive, as consideration for the exchange of property, either a joint interest in property which cannot be sold without the consent of all the joint owners or an individual interest in a whole in which others have individual interests and which, by agreement, cannot be sold without the consent of all the parties in interest, we are of the opinion that the test to be applied in determining whether taxable income has been derived is not whether the property has a market value and is convertible into cash by such person, but whether it has a market value and is convertible into cash by those who, under the agreement of the parties, are vested with the power of sale. In other words, where a person voluntarily exchanges his property for other property under conditions that vest the power to sell the property received jointly in him and other persons, he receives taxable income to the extent of the profit derived from the transaction, if the property received has a market value and is salable by those in whom the power of sale is vested under his voluntary agreement.

It may be true that stock of the corporation separated entirely from the right to any use of an apartment would have no fair market value, but the stock of the building corporation was not intended to be so separated. No one would buy as an investment the stock so separated. But the facts show that the requisite amount of stock in the hands of one who wished a tenancy in the building and who had been accepted as a tenant was very valuable and was salable at a fair market value. The fact that two of the apartments have not been leased and the requisite stock to support such leases has not been sold at the price at which the owners held the stock does not disclose that the stock was not of the fair market value of $100 a share. The building, one of the finest in Chicago in an area of other fine hotels and apartments, cost more than a million dollars; it had 17 apartments with 12 to 14 rooms in each apartment; the yearly rental value of each apartment was $12,000; a 99-year lease of an apartment in 1927 was of the value of $120,000. These values were given by petitioner's witness, whose testimony, however, as to the fair market value of the stock had reference to stock irretrievably separated from the possibility of a lease, a situation not present here, and is of doubtful value to us on that account in deciding the issue before us.

While ownership of 323–9/17 shares of stock was necessary to the acquisition of a lease, that was not all that was required to obtain and

hold a lease. Under the bylaws and the form of lease contract required many burdens were placed upon the lessee. In addition to a nominal $1 a year rent, he was required to assume and pay his part of the existing mortgage debt on the property, at that time amounting to $44,117.65 for each tenant, and to pay his proportionate part of maintenance cost, general taxes, water rates, insurance premiums, repairs, interest on mortgages which might be given from time to time in the discretion of the directors, cost of financing mortgages, payment of liens, reserves set up in the discretion of the directors to meet any unexpected or extraordinary expense, and much other expense provided for in the contract of lease.

We sustain the respondent in his determination of the fair market value of the stock of the building corporation when acquired by petitioner, and as to the basis for gain on the sale of the stock when a portion of it was sold in 1927 by petitioner.

It was stipulated at the hearing that the original stockholders paid commissions to brokers for negotiating the sales to Lawson and Cudahy in the sum of $2,973.52, a pro rata portion of which, according to stock ownership, was allocated to and paid by petitioner. This amount will be considered in a recomputation under Rule 50.

*Decision will be entered under Rule 50.*